

# THE ATTORNEY GENERAL
# OF TEXAS

AUSTIN 11, TEXAS



Gerald C. Mann
~~WILL WILSON~~
~~ATTORNEY GENERAL~~

Railroad Commission
of Texas
Austin, Texas

Gentlemen:

Opinion No. O-2867

Re:  Whether fact that applicant for
motor bus certificate proposes to oper-
ate at lower fares than existing car-
riers may be considered as evidence on
the issue of convenience and necessity;
and other related issues.

In your letter of October 21, 1940, you submit to us
the following request for an opinion:

"There is now pending before the Motor Transporta-
tion Division of the Railroad Commission of Texas an ap-
plication filed by a common carrier motor bus carrier,
which is now authorized to transport, and is transporting,
interstate passengers for hire, for a certificate of con-
venience and necessity, authorizing it to transport intra-
state passengers upon the same buses that the bus carrier
is now using in its interstate bus operation.

"In the pending application, and at a hearing that
was held thereon, the applicant under proper allegations
contained in said application contended (and proffered
proof in support of such unusual contentions) as follows,
to-wit:

"(1)  That the type of service offered by the appli-
cant is a distinctive service by reason of the low cost
of its transportation services to its passengers, it be-
ing asserted in the application that the rates of fare
would be approximately twenty-five percent (25%) lower
than the rates of fare offered by the existing bus facili-
ties serving the same territory, and by reason of other
advantages offered the traveling public, including free
meals, are elements bearing upon, and having relation to,
public convenience and necessity and the adequacy or in-
adequacy of existing carrier service, which would support
an application for the certificate of convenience and
necessity such as the applicant is applying for.

"(2)  That in view of the existing interstate opera-
tions by the applicant and its proposal to apply to its
proposed intrastate operations for which a certificate of

convenience and necessity is sought, the same rates which it now carries, is an element and factor bearing upon, and having relation to, public convenience and necessity and the adequacy or inadequacy of existing carrier service which would support an application for the certificate of convenience and necessity such as the applicant is applying for.

"(3)  That the granting of an application for the inauguration of the service will create a competitive situation which is highly desirable in the public interest, which is material to, and a proper element and factor of, public convenience and necessity, which would support an application for certificate of public convenience and necessity such as applicant is now applying for.

"(4)  That applicant's proposed bus service will not affect other intrastate carriers serving the same territory, routes, and points, adversely, is material to, and a proper element of, public convenience and necessity, and the adequacy or inadequacy of existing carrier facilities which would support an application for a certificate of convenience and necessity such as the applicant is now applying for .

"(5)  That by the application of lower rates to intrastate motor carrier bus fares, a new strata of bus traffic will be reached and opened up by reason thereof, which traffic is now moving either through the use of private transportation facilities, travel bureaus, hitch hiking, other facilities, or not moving at all, due to the existing higher rates of fares, which new strata of bus traffic applicant is seeking to reach, and from which it proposes to obtain its bus traffic, in the event the application is granted, all of which are elements and factors of convenience and necessity and adequacy or inadequacy of existing carrier facilities which would support an application for a certificate of public convenience and necessity such as the applicant is now applying for.

"(6)  That the sleeper coach service, with facilities equivalent to that of a Pullman passenger train coach, and free meals to its passengers, which applicant proposes to furnish are factors and elements of public convenience and necessity and the adequacy or inadequacy of existing carrier facilities which would support an application for a certificate of convenience and necessity such as the applicant is now applying for.

"In presenting such contentions the applicant urges same as elements of public convenience and necessity and

the adequacy or inadequacy of existing carrier facilities whether considered separately, or in conjunction with each other, as well as other and USUAL proper constituent elements and factors of public convenience and necessity and adequacy or inadequacy of existing carrier facilities.

"Quaere - Please give me your legal opinion as to whether or not the Railroad Commission of Texas should permit and consider allegations and proof in support of the UNUSUAL elements and factors herein above outlined, in paragraphs numbered one to six, inclusive, and in determining such application, consider same as elements and factors of, and as bearing upon, and having relation to, public convenience and necessity and the adequacy or inadequacy of existing passenger carrier facilities."

As we understand, a hearing was commenced on the application filed by All-American Bus Lines, Inc., and was recessed in order to obtain an opinion for the Railroad Commission's guidance in conducting the hearing. In order to better understand these questions we obtained from you and have read the application for certificate. You do not ask our opinion concerning the sufficiency of the application as respects any of the questions submitted by you and nothing herein said by us should be construed as touching upon the sufficiency or insufficiency of the application on any question. You specifically say in the second paragraph of your letter that the applicant offered the proof and contentions under "proper allegations," and we assume that if the application does not now or is not made to contain proper allegations upon which to base the evidence that it will be rejected.

We will first dispose of the types of evidence and contentions suggested in subdivisions numbered (2) and (3) of your letter in that order.

If we understand contention No. (2) correctly, it seems that some advantage is claimed on account of the fact that All-American already holds authority from the Interstate Commerce Commission to carry on an interstate business over the same route. It is our opinion that such fact is not involved in the question of inadequacy of existing intrastate services nor of the need of additional facilities to serve intrastate. The holder of an interstate certificate stands in no better light when applying for intrastate rights than does one who has no certificate authorizing him to handle interstate traffic. He must establish the inadequacy of existing services and the need of

additional facilities under the same rules, whether he already holds an interstate certificate or not.  In the first place the statute (Article 911a, Vernon's Civil Statutes) provides for no difference.  And in the second place, the need of additional intrastate services had not entered into the action of the Interstate Commerce Commission.  Purely intrastate carriers would not have been prejudiced in the granting of interstate rights by the Interstate Commerce Commission and could hardly have protested the same.  When an interstate carrier applies to the Railroad Commission for an intrastate certificate, it would seem that to indulge any presumptions in his favor on the issue of convenience and necessity, or to lighten the bur_ den on him, would be depriving existing carriers, in a measure, of the right to defend their services and prove the adequacy thereof.  From the opinion of the Supreme Court of Ohio, in Canton v. Public Utilities Commission, 174 N.E. 244, we quote:

> "An operator of an interstate motor transportation service, seeking a certificate of convenience and necessity to operate an intrastate motor transportation service, stands in no more favorable position by reason of his pos-session of an interstate certificate than he woukd without such certificate, since his possession of such certificate is not predicated upon the existence of a convenience and necessity.  The burden upon such applicant of showing convenience and necessity is the same as though he were making his initial appearance in the motor transportation world. ***."

> "***.

> "We can not escape the conclusion that the fact that the applicant possessed an interstate certificate over the same route, and by its application for an intrastate certificate simply sought permission to supplement its interstate service by an intrastate service, without either increasing its equipment or changing its schedule, was the controlling consideration in the minds of the commission in the finding and order made.  On affirmance of such finding and order would but indicate a convenient and effective way to secure a certificate of convenience and necessity to operate a motor transportation company within the state wherever and whenever an applicant has established an interstate route, the establishment of which the commission was without power to prevent."

In so far as contention No. (2) concerns the offer of a lower fare, our discussion of contention No. (1) will be applicable.

Regarding contention No. (3), it seems to us that whether competition is desirable is largely the ultimate question, depending upon the adequacy or inadequacy of existing facilities and whether additional services are needed. There should be no assumption that another carrier should be in the field. It must be remembered that the burden is on the applicant to plead and show by evidence that existing services are inadequate and that additional facilities or services are needed. Section 8 of Article 911a; Railroad Commission v. Shupee, 57 S.W.(2d) 295, 73 S.W. (2d) 505. The mere fact that competition would be introduced by the granting of a certificate should not be considered as having met to any extent whatsoever this burden upon the applicant.

We now refer to contention No. (1), which essentially resolves itself into the question as to whether the proposal to operate at substantially lower fares--attended we presume with proof to show that such operation is feasible and possible --may be shown and considered on the issue of convenience and necessity. A reading of the opinion of the Interstate Commerce Commission discloses that in granting All-American's application for interstate rights that body received and considered such offer and evidence in support thereof on such issue.

Section 3, and subsections (a) and (b) of Section 4, Article 911a, Vernon's Civil Statutes, read:

"Sec. 3. It is hereby declared that when existing transportation facilities on any highway in this State do not provide passenger service which the Commission shall deem adequate to provide for public convenience on such highway, then such inadequacy of service shall be considered as creating a condition wherein the public convenience and necessity require the designation of, and provision for, additional service on such highway, and it shall be the duty of the Commission to issue certificate or certificates as herein provided, if in the opinion of said Commission the issuance of such certificate will promote the public welfare.

"Sec. 4. (a) The Commission is hereby vested with power and authority, and it is hereby made its duty to supervise and regulate the public service rendered by every motor bus company operating over the highways in this State, to fix or approve the maximum, or minimum, or maximum and minimum, fares, rates or charges of, and to prescribe all rules and regulations necessary for the government of, each motor bus company; to prescribe the routes, schedules, service, and safety of operations of each such motor bus company; to acquire the filing of such annual or

other reports and of such other data by such motor bus
company as the Commission may deem necessary.

"(b)    The Commission is hereby vested with authority
to supervise, control and regulate all terminals of motor
bus companies, including the location of facilities and
charges to be made motor bus companies for the use of such
terminal, or termini; provided' that the Commission shall
have no authority to interfere in any way with valid con-
tracts existing between motor bus companies and the owner
or owners of motor bus terminals at the time of the pass-
age of this Act."

In Fornarotto v. Board of Public Utility Com'rs., 143
Atl. 450, Supreme Court of New Jersey, it was held that an of-
fer to operate at lower fare does not alone establish necessity
and convenience, authorizing the grant of a public utility fran-
chise to a bus company.  In Seaboard Air Line Ry. Co. v. Wells,
130 So. 587, it was observed that "a cheaper rate, as we have
seen, does not of itself authorize the granting of a certificate."

While we are convinced that the mere offer to render
the service at lower fares, standing alone, would not be a suf-
ficient showing of public convenience and necessity to sustain
a certificate, we have concluded that in a proper case such an
offer -- especially when supported with proof tending to show
that operations could be conducted successfully under the re-
duced fare -- may be considered by the Commission for what it
is worth on the issue of convenience and necessity.  In fact,
as we understand the opinion in Southland Greyhound Lines v.
Railroad Commission, 73 S.W. (2) 604, by the Austin Court of
Civil Appeals, the lower fare proposed by the applicant was con-
sidered by the Court as evidence of public convenience and ne-
cessity in affirming the trial court's judgment sustaining a
certificate.  From that opinion we quote excerpts as follows:

" ***.  Appellant contacted members of the board and
offered to establish additional bus services, and submitted
in writing its tentative or proposed bus schedules and
rates or fares.  Appellee likewise submitted proposed sched-
ules and rates or fares.  A comparison of the two propos-
als revealed that appellee's proposed services were better
adapted to the needs of Randolph Field and provided for
lower rates or fares.  The concessions board recommended
that appellee's proposal be accepted; and the contract at-
tached to appellee's application for the permit was enter-
ed into between appellee and the War Department.  A com-
parison of the bus services provided by the contract with
those proposed by appellant reveals that they are better
adapted to the needs of Randolph Field, as follows:  (a)

Appellee's services offered better schedules as to hours of operation; (b) more schedules; (c) appellee's services were not burdened with transporting the general traveling public between San Antonio and Houston, thereby rendering practically exclusive services for the personnel of Randolph Field: (d) appellee's contract gave it the exclusive right to enter into the post or private government property for the purpose of picking up and discharging passengers, and appellee was required to post schedules and provide for sale of tickets at the Army Y.M.C.A. under the terms of his contract, and these privileges and services were shown to be much more convenient for the personnel of Randolph Field than the proposed services of appellant, which required them to go off the government post or property, and to board and leave buses on the public highway passing by or through a portion of Randolph Field; (e) appellee's rates or fares were lower; and (f) appellee unconditionally contracted to furnish a school bus for transporting the children of the enlisted men and officers to and from school in San Antonio.

"***.

"The evidence showed that while appellant may have been able to render the additional services, it was neither ready nor willing to do so. At least appellant was given the opportunity by the Randolph Field authorities to propose schedules and rates; but it only proposed tentative and unsatisfactory schedules and rates. As a competitor for the additional services, appellee proposed schedules better adapted to the needs of Randolph Field and lower as to rates or fares; and proposed to operate a school bus, which appellant did not propose to do unless there should be such a number of school children as would be satisfactory to appellant. In determining the adequacy of the additional services demanded by Randolph Field, the Railroad Commission was also authorized to consider the fact that the War Department had investigated and selected appellee and had by contract clearly defined and prescribed the character of services desired, with special privileges granted appellee to enter on government property in order that he might better serve the traffic."

We regard the proposal to furnish free meals as being a part of the offer to operate at lower fares.

We will not consider contention No. (5), urging that applicant should be permitted to show that a new strata of traffic will be reached, that is, a field composed of poor people unable to pay present fares and who now travel through travel bureal arrangements, as hitch-hikers, etc., and others who are

now unable to travel at all on account of high fares.

From Railway Co. v. State, et al, 252 Pac. 849, by the Supreme Court of Oklahoma, we quote:

"It is held in Choate et al. v. Ill. Commerce Commission, 309 Ill. 248, 141 N.E. 12:

"'That a proposed bus line, serving the same territory as an established interurban line, may accommodate a few individuals, does not justify a certificate permitting it to operate; the convenience and the necessity which the law requires being the convenience and necessity of the public, as distinguished from that of an individual, or any number of individuals.'"

To similar effect, see also Lake Shore Electric Co. v. Public Utilities Commission, 154 N.E. 239, Ohio Supreme Court; West Suburban Transp. Co. v. Chicago & W.T. Ry. Co., 140 N.E. 56, Illinois Supreme Court.

Nevertheless, until it hears the evidence the Railroad Commission cannot tell the extent to which it may go. The testimony which may be adduced in support of these allegations may prove to be trivial and may not even tend to show a public need for the new service. However, it is at least conceivable that substantial evidence of this nature may be offered showing a substantial public need. The Commission may hear this evidence and consider the same for what, if anything, it may be worth. It is thought that the showing sought to be made in contention No. (4) is supplemental to that involved in No. (5), discussed immediately above, and our answer is the same as to it.

We now address ourselves to contention No. (6). We have already considered the matter of free meals. Whether there is actually a need for sleeper coach service over this route, and if so, the extent thereof, can be told only after hearing the evidence. The proposal to furnish overnight sleeping service between Dallas and Fort Worth on the one hand, and El Paso on the other, coupled with allegations that there is a public need and demand for it, and that such is not now available, to our minds presents a proper inquiry involving convenience and necessity. Whether such allegations may be properly sustained is another question. In our opinion the evidence should be admitted for whatever, if anything, it may prove to be worth to the Commission.

          This answers your questions as best we can considering the form of their submission.

                                   Yours very truly

                                   ATTORNEY GENERAL OF TEXAS

                                   By /s/ Glenn R. Lewis
                                   Glenn R. Lewis, Assistant

APPROVED DEC 5, 1940
/s/ Gerald C. Mann
ATTORNEY GENERAL OF TEXAS

APPROVED: OPINION COMMITTEE
BY:      BWB, CHAIRMAN

GRL:RS:wb